No. 1:16-cv-02475-REB

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

*IN RE*
UNITED WESTERN BANCORP, INC.

*Debtor.*

FEDERAL DEPOSIT INSURANCE CORPORATION,
IN ITS CAPACITY AS RECEIVER FOR UNITED WESTERN BANK,

*Defendant-Appellant,*

— v. —

SIMON E. RODRIGUEZ,
IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF
UNITED WESTERN BANCORP, INC.,

*Plaintiff-Appellee.*

Bankruptcy Appeal from Adversary Proceeding No. 14-01191-TBM

## OPENING BRIEF OF APPELLANT

JOHN F. YOUNG
Markus Williams Young
  & Zimmermann LLC
1700 Lincoln Street, Suite 4550
Denver, CO 80203
(303) 830-0800

*Of Counsel:*
B. AMON JAMES
Senior Counsel
SONYA L. LEVINE
Counsel
Federal Deposit Insurance Corporation
3501 North Fairfax Drive
Arlington, Virginia 22226
Tel. (703) 562-2783

JOHN J. CLARKE, JR.
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020
(212) 335-4500

Attorneys for Appellant
  Federal Deposit Insurance Corporation,
  as Receiver for United Western Bank

## Table of Contents

Page

STATEMENT OF JURISDICTION .......................................................................1

QUESTIONS PRESENTED .................................................................................2

STATEMENT OF THE CASE ..............................................................................4

     A.     Parties .............................................................................................4

     B.     The Federal Tax Refunds .................................................................5

     C.     The Adversary Proceeding ...............................................................6

     D.     The Opinion and Order ....................................................................8

SUMMARY OF ARGUMENT .............................................................................10

ARGUMENT .......................................................................................................15

I.     THE BANKRUPTCY COURT MISAPPLIED APPLICABLE LAW
     AND CREATED A WINDFALL FOR BANCORP'S CREDITORS .........15

     A.     Participating in a Joint Return Does Not Transfer Ownership of
           Tax Refunds from Group Members to Their Common Parent ..........16

     B.     There Is No "Limited and Procedural" Agency in Which
           an Agent Gains Ownership Rights in Property
           It Receives for Its Principal. ............................................................21

     C.     Bancorp's Bankruptcy Did Not Alter the Parties' Rights in
           Tax Refunds Received by Bancorp as Agent .................................25

i

Page

II.   THE BANKRUPTCY COURT'S ANALYSIS CONFLICTS
      WITH THE PLAIN LANGUAGE OF THE AGREEMENT ......................28

      A.    The Bank Did Not Agree to Transfer Ownership of its
            Tax Refunds in the Tax Allocation Agreement  ................................28

      B.    To Comply With Federal Banking Law, the Tax Allocation
            Agreement Adopts Provisions Protecting the Bank...........................32

CONCLUSION ...................................................................................................36

EXHIBIT A (Tax Allocation Agreement dated as of January 1, 2008)

# **Table of Authorities**

Page(s)

## Cases

*Ad Two, Inc. v. City & County of Denver*,
   9 P.3d 373 (Colo. 2000) (*en banc*) ......................................................................3

*Barnes v. Harris*,
   783 F.3d 1185 (10th Cir. 2015) ................................................... 2, 10, 18-20, 31

*Begier v. Internal Rev. Svc.*,
   496 U.S. 53 (1990).......................................................................................26

*Bullion Servs., Inc. v. Valley State Bank*,
   50 F.3d 705 (9th Cir. 1995) ..........................................................................3

*Butner v. United States*,
   440 U.S. 48 (1979).................................................................................11, 25

*Cantor v. F.D.I.C. (In re Downey Fin. Corp.)*,
   593 F. App'x 123 (3d Cir. 2015) (*per curiam*)................................................24

*Capital Bancshares, Inc. v. F.D.I.C.*,
   957 F.2d 203 (5th Cir. 1992) .......................................................................19

*City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*,
   329 F.3d 204 (1st Cir. 2003).....................................................................26, 28

*Cox v. Metropolitan State Bank, Inc.*,
   336 P.2d 742 (Colo. 1959)...........................................................................27

*E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*,
   109 P.3d 969 (Colo. 2005)...........................................................................29

*Essex Ins. Co. v. Vincent*,
   52 F.3d 894 (10th Cir. 1995) .......................................................................32

*F.D.I.C. v. AmFin Fin. Corp.*,
   757 F.3d 530 (6th Cir. 2014) ................................................................*passim*

iii

Page(s)

*F.D.I.C. v. Zucker (In re NetBank, Inc.)*,
729 F.3d 1344 (11th Cir. 2013) ...................................................................*passim*

*Giuliano v. F.D.I.C. (In re Downey Fin. Corp.)*,
499 B.R. 439 (Bankr. D. Del. 2013),
*aff'd mem. sub nom. Cantor v. F.D.I.C. (In re Downey*
*Fin. Corp.),* 593 F. App'x 123 (3d Cir. 2015) (*per curiam*) .......................... 8-9

*Greenfield Direct Resp., Inc. v. ADCO List Mgmt. (In re Greenfield Direct*
*Resp., Inc.)*, 171 B.R. 848 (Bankr. N.D. Ill. 1994).............................................26

*Imperial Capital Bancorp, Inc. v. F.D.I.C. (In re Imperial*
*Capital Bancorp, Inc.)*, 492 B.R. 25 (S.D. Ca. 2013) .......................................23

*In re Universal Service Fund. Tel. Billing Practice Litig.*,
619 F.3d 1188 (10th Cir. 2010) ............................................................................3

*In re West Central Housing Org.*,
338 B.R. 482 (Bankr. D. Colo. 2005)..................................................................28

*Kitchen v. Boyd (In re Newpower)*,
233 F.3d 922 (6th Cir. 2000) ...............................................................................26

*Level 3 Comm'ns, LLC v. Liebert Corp.*,
535 F.3d 1146, 1154 (10th Cir. 2008) ................................................................34

*Lubin v. Cincinnati Ins. Co.*,
677 F.3d 1039 (11th Cir. 2012) ...........................................................12, 17, 26

*Lubin v. F.D.I.C.*,
No. 1:10-CV-00874, 2011 WL 825751 (N.D. Ga. Mar. 2, 2011).....................29

*Mancuso v. United Bank of Pueblo*,
818 P.2d 732 (Colo. 1991)..................................................................................27

*Montano v. Land Title Guarantee Co.*,
778 P.2d 328 (Colo. App. 1989).........................................................................24

*Moore & Co. v. T-A-L-L- Inc.*,
792 P.2d 794 (Colo. 1990)..........................................................................11, 22

iv

Page(s)

*Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.),*
    75 F.3d 1447 (10th Cir. 1996) ...........................................................24

*Northern Ins. Co. v. Elkstrom,*
    784 P.2d 320 (Colo. 1989) ................................................................32

*Rollins v. Neilson (In re Cedar Funding, Inc.),*
    408 B.R. 299 (Bankr. N.D. Cal. 2009) .............................................27

*Rushton v. State Bank of S. Utah (In re Gledhill),*
    164 F.3d 1338, 1340 (10th Cir. 1999) ...............................................3

*Stortroen v. Beneficial Fin. Co.,*
    736 P.2d 391 (Colo. 1987) (*en banc*) ...........................................21, 23

*T&B Scottsdale Contractors, Inc. v. United States,*
    866 F.2d 1372 (11th Cir. 1989) ........................................................26

*Team Fin., Inc. v. F.D.I.C. (In re Team Fin., Inc.),*
    Adv. Proc. No. 09-5084, 2010 WL 1730681
    (Bankr. D. Kan. Apr. 27, 2010) ........................................................23

*Total Petroleum, Inc. v. Farrar,*
    787 P.2d 164 (Colo. 1990) ................................................................34

*Wadsworth v. High Speed Aggregate, Inc. (In re Trick*
    *Techs., Inc.),* Adv. Proc. No. 12-01622, 2013 WL 3865592
    (Bankr. D. Colo. July 22, 2013) ................................................. 27-28

*W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-*
    *Plymouth Corp.),* 473 F.2d 262 (9th Cir. 1973) ........................................*passim*

*Wellness Int'l, Inc. v. Sharif,*
    ___ U.S. ___, 135 S. Ct. 1932 (2015) ................................................2

*Zucker v. F.D.I.C. (In re BankUnited Fin. Corp.),*
    727 F.3d 110 (11th Cir. 2013) ............................................... 13, 31-32

v

Page(s)

## Statutes and Regulations

11 U.S.C. § 109 .................................................................................15

11 U.S.C. § 541 ............................................................................*passim*

12 U.S.C. § 371c ..........................................................................14, 33

12 U.S.C. § 371c-1 ..............................................................................33

12 U.S.C. § 1821(d) .........................................................................4, 15

26 U.S.C. § 172 ....................................................................................5

26 U.S.C. § 1501 .................................................................................16

28 U.S.C. § 157 ...............................................................................1, 2

28 U.S.C. § 158(a)(1) ............................................................................1

28 U.S.C. § 1334(b) ..............................................................................1

12 C.F.R. §§ 223.1. ........................................................................14, 33

Treas. Reg. § 1.1502-6(a) .....................................................................16

Treas. Reg. § 1.1502-11(a) ...................................................................16

Treas. Reg. § 1.1502-13 .......................................................................16

Treas. Reg. § 1.1502-75(b) ...................................................................22

Treas. Reg. § 1.1502-77(a)(1) ......................................................2, 11, 16-17

Treas. Reg. § 1.1502-77(d)(5)...........................................................*passim*

Page(s)

## Other Authorities

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .............. 26-27

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 .................. 26-27

Interagency Policy Statement on Income Tax Allocation in a
    Holding Company Structure, 63 Fed. Reg. 64757 (Nov. 23, 1998)............. 33-35

Restatement (Second) of Agency § 1(1)................................................................24

Restatement (Second) of Agency § 3....................................................................21

Restatement (Second) of Agency, § 427 ..........................................................18, 22

Restatement (Third) of Agency, § 8.12, *cmt. b*................................................11, 22

## STATEMENT OF JURISDICTION

This is an appeal from an opinion and order ("Opinion" or "Op.") and final judgment entered on September 16, 2016 by the United States Bankruptcy Court for the District of Colorado (McNamara, J.) in an adversary proceeding brought by plaintiff-appellee Simon E. Rodriguez, as chapter 7 trustee ("Trustee") for the bankruptcy estate of United Western Bancorp, Inc. ("Bancorp"). (A373, A402).[1]

In its Opinion, the bankruptcy court granted summary judgment in favor of the Trustee and against defendant-appellant Federal Deposit Insurance Corporation, in its capacity as receiver ("FDIC-Receiver") for United Western Bank (the "Bank"), concerning the ownership of federal tax refunds amounting to roughly $4.1 million.  The refunds were the result of joint tax filings by the affiliated group of taxpayers that included both Bancorp, as common parent, and the Bank, as the principal operating company.  The FDIC-Receiver filed a timely notice of appeal on September 30, 2016, in which it elected for this appeal to proceed in the district court.  (A406).  This Court has jurisdiction under 28 U.S.C. § 158(a)(1).

In the proceedings below, the bankruptcy court had subject matter jurisdiction under 28 U.S.C. §§ 157(a) and 1334(b).  The adversary proceeding

---

[1] The Opinion has been reported.  *See Rodriguez v. F.D.I.C. (In re United Western Bancorp, Inc.)*, 558 B.R. 409 (Bankr. D. Colo. 2016).

arose out of or was related to Bancorp's chapter 7 bankruptcy case, *In re United Western Bancorp, Inc.*, Case No. 12-13815 (TBM).  In their pleadings, the parties disagreed whether the adversary proceeding was a core proceeding or a non-core proceeding under 28 U.S.C. § 157.  (A017, A049).  The FDIC-Receiver later consented to entry of final orders and judgment by the bankruptcy court.  (A007) [Doc. No. 53].  Because of the FDIC-Receiver's consent, the question whether this was a core or a non-core proceeding has no bearing on the appeal. *See Wellness Int'l, Inc. v. Sharif*, ___ U.S. ___, 135 S. Ct. 1932, 1944-45 (2015).

## QUESTIONS PRESENTED

1.    "[A] tax refund due from a joint return generally belongs to the company responsible for the losses that form the basis of the refund." *Barnes v. Harris*, 783 F.3d 1185, 1195 (10th Cir. 2015).  In this case, the Bank's losses, income and prior tax payments were the basis for $4.1 million in federal tax refunds recovered by the affiliated group.  Bancorp was the common parent of the group and therefore was appointed "sole agent" for dealings with taxing authorities on behalf of group members, including receiving their tax refunds. *See* Treas. Reg. §§ 1.1507-77(a)(1), (d)(5).  A tax allocation agreement dated as of January 1, 2008 confirmed that agency and emphasized that Bancorp acted as "merely . . . an

intermediary" in its dealings with taxing authorities.[2]  Did the bankruptcy court misapply applicable principles of law when it held that tax refunds received by Bancorp as agent became Bancorp's property therefore leaving the FDIC-Receiver (as the Bank's successor) with a worthless bankruptcy claim arising under the tax allocation agreement?  This is a question of law that is subject to *de novo* review. *Rushton v. State Bank of S. Utah (In re Gledhill)*, 164 F.3d 1338, 1340 (10th Cir. 1999).

2.     Did the bankruptcy court misread the plain language of the tax allocation agreement as transferring ownership to Bancorp of the Bank's tax refunds when the agreement did not include any such provision but instead expressly reaffirmed Bancorp's role as intermediary and agent, especially in view of the agreement's direction that any ambiguity, if found, is to be resolved in favor of the Bank?  This is a question of contract interpretation that is subject to *de novo* review.  *In re Universal Service Fund. Tel. Billing Practice Litig.*, 619 F.3d 1188, 1203 (10th Cir. 2010); *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000) (*en banc*).

---

[2] In accordance with this Court's order on briefing in this appeal, a copy of the tax allocation agreement ("TAA") is attached to this brief as Exhibit A.  It is also reproduced in the accompanying Appendix.  (A041-46).

## STATEMENT OF THE CASE

### A.   <u>Parties</u>

Congress created the FDIC "to promote stability and restore and maintain confidence in the nation's banking system."   *Bullion Servs., Inc. v. Valley State Bank*, 50 F.3d 705, 708 (9th Cir. 1995) (citation and internal quotation omitted).  In distinct legal capacities, the FDIC acts (i) as the deposit insurer and regulator for operating banks and thrifts and (ii) as the receiver for failed depository institutions.  *See id.*, at 708-09.  When an insured bank is closed, the FDIC as receiver succeeds to "all rights, titles, powers, and privileges" of the failed institution.  12 U.S.C. § 1821(d)(2)(A).  The FDIC as receiver seeks to maximize the return on a failed institution's assets in order to pay claims of depositors and the institution's other creditors.  12 U.S.C. §§ 1821(d)(10), (11), (13)(E).

United Western Bank was an insured thrift based in Denver, Colorado.  It was a wholly owned subsidiary of Bancorp.  Compl. ¶ 12 (A017).  On January 21, 2011, the Office of Thrift Supervision closed the Bank and appointed the FDIC-Receiver as its receiver.  *Id.* ¶ 11 (A017).

On March 2, 2012, with its principal operating subsidiary in receivership, Bancorp filed a chapter 11 bankruptcy petition.  *Id.* ¶ 7 (A017).[3]  On April 15,

---

[3] On the date of its bankruptcy petition, a Bancorp representative stated that it owed $13.5 million in secured debt, $10.35 million in subordinated notes, and

4

2013, the bankruptcy court granted a motion to convert the case to a chapter 7 liquidation.  *Id.* ¶ 8 (A017).   The Trustee was appointed chapter 7 trustee soon thereafter.  *Id.* ¶ 9 (A017).

### B.    The Federal Tax Refunds

The federal tax returns for 2008 that were filed by Bancorp on behalf of the affiliated group reported taxable income of $34,397,709, all of which was generated by the Bank.  (A130).   Bancorp itself did not generate any taxable income in 2008.  *Id.*   In 2010, the Bank experienced at least $35,351,690 in operating losses.  Based on the Bank's net operating losses for the 2010 tax year, the affiliated group filed a request for a carryback refund of $4,846,625 to recover federal income taxes paid in 2008 and 2009.[4] (A131).

In December 2015, the Trustee and the FDIC-Receiver, working together, resolved audit disputes with the Internal Revenue Service ("IRS") concerning the group's federal tax returns for 2009.  *See* Chapter 7 Trustee's Motion to Approve Compromise and Settlement of IRS Audit, dated December 29, 2015 [Bankr. Doc. No. 469].  The bankruptcy court approved that settlement in an order entered on

---

$34.1 million in junior subordinated debentures and had assets of $4.32 million not including the tax refund at issue.  (A108-12).

[4] The federal tax code permits a corporate taxpayer to carry back a net operating loss sustained in any taxable year to offset taxes paid in each of the two preceding taxable years, resulting in a refund of the taxes previously paid. 26 U.S.C. § 172(b)(1)(A).

5

February 8, 2016, which cleared the way for the IRS to pay a carryback refund based on the group's 2010 net operating loss deduction.  [Bankr. Doc. No. 486].

In April 2016, the Trustee received two checks from the United States Treasury reflecting tax refunds to the affiliated group in the aggregate amount of $4,081,334.67.   In accordance with an order of the bankruptcy court that previously had been agreed upon between the Trustee and the FDIC-Receiver, the tax refunds were deposited in the bankruptcy court's registry pending resolution of the parties' ownership dispute.  *See* Op. at 7.

## C.   <u>The Adversary Proceeding</u>

On August 30, 2012, the FDIC-Receiver timely filed a proof of claim in Bancorp's bankruptcy case.  Among other matters, the proof of claim identified tax-related claims amounting to roughly $4.8 million, including pending or possible tax refunds, which the FDIC-Receiver asserted were "owned by [the Bank] and are not assets of Bancorp."  (A026-38 at A031).  As the proof of claim explained, Bancorp acted solely as agent and fiduciary for the Bank in receiving such refunds on the Bank's behalf.  *Id.*   In the alternative, the proof of claim asserted a claim against Bancorp in the amount of such refunds "to the extent that [the Bank's] asserted right to such refunds is determined to be a claim . . . " *Id.*

On April 16, 2014, the Trustee filed his complaint in the adversary proceeding.  In the complaint, the Trustee objected to the FDIC-Receiver's proof

of claim, including its assertion that any tax refunds recovered by the affiliated group were the Bank's property rather than Bancorp's.   The complaint also requested a declaratory judgment that Bancorp would be the owner of any tax refunds arising from the group's consolidated tax returns and that the FDIC-Receiver was merely a general unsecured creditor under a tax allocation agreement between Bancorp and the Bank as to refunds that Bancorp received for the group. (A016-22).[5]   On November 25, 2014, the FDIC-Receiver filed its answer and asserted a counterclaim against the Trustee seeking a declaratory judgment that the FDIC-Receiver, as the successor in interest to the Bank, is the owner of all federal and state income tax refunds recovered or recoverable by or on behalf of the affiliated group.[6] (A047-68).

On October 30, 2015, the FDIC-Receiver and the Trustee each filed motions for summary judgment.  The bankruptcy court heard argument on those motions on February 10, 2016.  (A262).

---

[5] The complaint also asserted a claim for turnover of refunds, but that count is not at issue in this appeal.  In addition, the FDIC-Receiver's proof of claim raised several claims other than tax-related claims against the Bancorp estate.  The adversary complaint included objections to those other claims, but those issues also are not at issue on appeal.

[6] Before answering, the FDIC-Receiver filed a motion to dismiss the adversary complaint for failure to state a claim.  [Adv. Doc. No. 12].  The bankruptcy court (Campbell, J.) denied the motion in an order entered on November 4, 2014.  (A012).  The adversary proceeding was reassigned to Judge McNamara on March 25, 2015.  (A011).

### D.   The Opinion and Order

On September 16, 2016, the bankruptcy court issued its Opinion.  (A373-401).  In the Opinion, the court granted summary judgment for the Trustee and against the FDIC-Receiver on the question of ownership of the tax refunds. Relying on provisions in the tax allocation agreement and in IRS regulations concerning consolidated tax returns, the court concluded that Bancorp had "at least bare legal title to" federal tax refunds because the group's tax refunds would be made "directly to and in the name of" Bancorp, as the "sole agent" for the group, thereby "discharg[ing] any liability of the Government to any member [of the group] with respect to such refund."  Op. at 13, 14 (quoting Treas. Reg. § 1.1502-77(d)(5)).

The court next found that the FDIC-Receiver had not shown the Bank was the "equitable owner" of the tax refunds under section 541(d) of the Bankruptcy Code, 11 U.S.C. § 541(d).  Op. at 14-27.  Instead, it concluded, the tax allocation agreement set up a debtor-creditor relationship between Bancorp and the Bank by providing for a "system of intercompany 'payments' and 'reimbursements'" relating to tax settlements.  Under that system, in the bankruptcy court's view, the Bank was merely a claimant against Bancorp under the tax allocation agreement for refunds received from the IRS.  Op. at 16 (quoting *Giuliano v. F.D.I.C. (In re Downey Fin. Corp.)*, 499 B.R. 439, 456 (Bankr. D. Del. 2013), *aff'd mem. sub*

*nom. Cantor v. F.D.I.C. (In re Downey Fin. Corp.),* 593 F. App'x 123 (3d Cir. 2015) (*per curiam*)).

The bankruptcy court acknowledged that the agreement confirmed Bancorp's appointment as the Bank's agent in all dealings with the IRS, but it concluded that this agency was "limited and procedural only." Op. at 21. The court then considered and purported to distinguish the only three published decisions from the United States Courts of Appeals to have addressed these issues, all of which reached a conclusion directly at odds with the bankruptcy court's analysis. Op. at 25-26.

Based on this reasoning, the bankruptcy court concluded that the Trustee was entitled to a declaratory judgment that the federal tax refunds at issue were property of Bancorp's chapter 7 estate under section 541 of the Bankruptcy Code. 11 U.S.C. § 541. Op. at 27. It denied the FDIC-Receiver's competing request for a declaratory judgment. *Id.* Instead, the court concluded that the FDIC-Receiver held an allowed general unsecured bankruptcy claim against Bancorp arising under the tax allocation agreement in the amount of the refunds. *Id.* at 28.

The bankruptcy court entered a separate judgment in the adversary proceeding in favor of the Trustee. (A402). Both the Opinion and the judgment directed the tax refunds being held in the registry of the bankruptcy court to be disbursed to the Trustee. On September 23, 2016, the FDIC-Receiver filed a

motion to alter or amend both documents because a prior order required refunds to be held in the court's registry until either the parties agreed to a settlement or a court of competent jurisdiction entered a final, non-appealable order determining ownership. (A006) [Doc. No. 60]. In an order entered on September 26, 2016, the bankruptcy court granted the FDIC-Receiver's motion and amended the Opinion and judgment accordingly. (A404). On September 30, 2016, the FDIC-Receiver timely filed its notice of appeal. (A406).

## SUMMARY OF ARGUMENT

1.     The bankruptcy court disregarded several settled principles of law to reach its conclusion that federal tax refunds paid to Bancorp as agent for the affiliated group became property of the Bancorp bankruptcy estate instead of belonging to the Bank. As the Tenth Circuit has recognized, "a tax refund due from a joint return generally belongs to the company responsible for the losses that form the basis for the refund." *Barnes v. Harris*, 783 F.3d 1185, 1195 (10th Cir. 2015). In this case, the Bank earned the income, paid the taxes and sustained the net operating losses that led to the tax refunds at issue, none of which was disputed by the Trustee.

Contrary to the bankruptcy court's conclusion, there was no provision in the tax allocation agreement that altered this principle of ownership and transferred the Bank's tax refunds to Bancorp without consideration. To the contrary, the tax

10

allocation agreement reaffirmed that Bancorp was acting "merely [as] an intermediary" for the Bank, and as its agent, which also is the relationship arising under federal tax law as the result of the group's election to file consolidated returns. *See* Treas. Reg. § 1.1502-77.

Once such an election has been made, tax regulations require that only the "common parent" can deal with the IRS on group tax issues. Any tax refunds recovered by the group are paid by the Treasury department "in the name of the agent" – the common parent – on behalf of the group. Treas. Reg. § 1.1502-77(d)(5). But the fact that a parent corporation receives federal tax refunds for group members does not mean it can treat those refunds as its own. Colorado law follows the well-established rule that an agent must safeguard and turn over property it receives for its principal. *See Moore & Co. v. T-A-L-L- Inc.*, 792 P.2d 794, 798 (Colo. 1990); *see* Restatement (Third) of Agency, § 8.12, *cmt.* b. There is no "limited" or "procedural" agency in which this fundamental duty does not apply, as the bankruptcy court erroneously held, and that conclusion was in direct conflict with the broad scope of agency in the tax allocation agreement that the court purported to rely on. *See* TAA § G.

A common parent's bankruptcy filing does not alter the analysis. Bankruptcy does not give a debtor any new property rights, *see Butner v. United States*, 440 U.S. 48, 55 (1979), and the Bankruptcy Code excludes property that a

debtor holds as agent from the definition of "property of the estate." *Lubin v. Cincinnati Ins. Co.*, 677 F.3d 1039 (11th Cir. 2012); *see* 11 U.S.C. § 541(d). Contrary to the bankruptcy court's reasoning, no language creating an express trust is necessary to obtain this result. *See F.D.I.C. v. AmFin Fin. Corp.*, 757 F.3d 530, 537 (6th Cir. 2014). The bankruptcy court's holding creates a windfall for Bancorp's creditors by converting a failed Bank asset that should be available to pay Bank receivership creditors into a Bancorp asset used to pay the debts of the bankrupt holding company instead.

2.      The bankruptcy court also committed error when it misread the tax allocation agreement as supporting the conclusion that the Bank transferred ownership of its refunds to Bancorp without consideration. There is no provision in the agreement that addresses ownership of tax refunds, nor did the bankruptcy court identify one. Instead, the bankruptcy court concluded that the provisions of the agreement established a debtor-creditor relationship between Bancorp and the Bank by providing for a series of fungible payment obligations regarding tax payments. In the court's mistaken view, that relationship supplanted the parties' pre-existing relationship as agent and principal. Op. at 15. The court's analysis

was directly at odds with the reasoning of three published appellate decisions that have considered the same question.[7]

In addition, the bankruptcy court's reading conflicts with the plain language of the tax allocation agreement. That agreement reaffirms the Bank's appointment of Bancorp as agent for the purpose of filing consolidated federal tax returns "or taking any action in connection therewith . . . ," TAA § G, and further provides that the Bank and other affiliates are to be treated as separate taxpayers "with [Bancorp] *merely being an intermediary* between an Affiliate and the [IRS]." TAA § A.2. (emphasis added). These contract provisions reaffirm the rule that would apply without any contract, namely, that participating in filing joint returns did not alter the Bank's ownership rights in its tax refunds. To similar effect, the tax allocation agreement confirms that the Bank, as a regulated affiliate, shall be "entitled to a refund equal to the amount it would have been entitled to receive had it not joined in the filing of a consolidated return . . ." TAA § A.1.

The reasonable construction of the tax allocation agreement as a whole therefore is one in which the Bank retained ownership of its tax refunds despite its participation in consolidated tax filings with the other members of the group. The bankruptcy court committed error by disregarding that reasonable reading. But

---

[7] *See AmFin*, 757 F.3d 530; *F.D.I.C. v. Zucker (In re NetBank, Inc.)*, 729 F.3d 1344 (11th Cir. 2013); *Zucker v. F.D.I.C. (In re BankUnited Fin. Corp.)*, 727 F.3d 110 (11th Cir. 2013).

even if the agreement is subject to two reasonable interpretations, the appeal still must be resolved in the FDIC-Receiver's favor because the agreement itself instructs that "[a]ny ambiguity in the interpretation hereof shall be resolved with a view to effectuating such intent in favor of any insured depository institution," that is, the Bank.   TAA § H.4.   The failure of the bankruptcy court to follow that instruction was further error.

These contract provisions protecting the Bank in its tax dealings with Bancorp were not accidental.   The tax allocation agreement largely incorporates instructions from federal banking regulators in an interagency policy statement explaining how tax settlements between banks and their holding companies would be evaluated given the strict restrictions in federal banking law on transactions between insured banks and their affiliates.   *See*   12 U.S.C. § 371c; 12 C.F.R. § 223.1, *et seq.*   The bankruptcy court's decision erroneously ignores that context.

The decision below should be reversed, and this Court should hold that the FDIC-Receiver is the owner of the disputed tax refunds as statutory successor-in-interest to the Bank.

ARGUMENT

## I.   THE BANKRUPTCY COURT MISAPPLIED APPLICABLE LAW AND CREATED A WINDFALL FOR BANCORP'S CREDITORS.

There are few contexts in which competing claims arise to the ownership of federal tax refunds received by a bankrupt parent corporation based on joint tax filings by its affiliated group.  In most bankruptcy cases, parent companies file for bankruptcy together with their subsidiaries, and ownership of the group's tax refunds is dealt with in the context of their joint bankruptcy plan.  That is not possible, however, when an insolvent company's main source of income was its insured bank or thrift subsidiary.  In those instances, the FDIC, as receiver, succeeds to the failed bank's property rights, 12 U.S.C. § 1821(d)(2)(A), and the failed bank is not included in any bankruptcy filing by the holding company or other affiliates, *see* 11 U.S.C. §§ 109(b)(2), (d) (banks not eligible to file bankruptcy petitions).

Bankruptcy law generally provides for ratable distribution to creditors who are similarly situated, and bankruptcy courts are accustomed to dealing with, and rejecting, arguments that a given creditor is entitled to an exception from this principle.  In the context of tax refunds recovered by an affiliated group of taxpayers, however, that instinct leads to mistaken results.  The bankruptcy court made such an error here.

The question in these cases is not whether the FDIC, as receiver, is entitled to a special privilege in the holding company's bankruptcy case. Instead, the question is whether the property at issue (tax refunds) is available *at all* for distribution to the holding company's creditors instead of being used to satisfy debts owed by the failed bank to which the refunds belong. Tax law, agency law and bankruptcy law all lead to one answer to that question, which is "no."

### A.   Participating in a Joint Return Does Not Transfer Ownership of Tax Refunds from Group Members to Their Common Parent.

Under the Internal Revenue Code, affiliated groups of corporations may elect to file a consolidated federal income tax return. 26 U.S.C. § 1501. Making such an election has tax benefits, including that losses suffered by one member of the group can be used to offset income earned by another member of the group resulting in a reduction of the group's consolidated tax liability.[8] *See* Treas. Reg. §§ 1.1502-11(a), 1.1502-13.

If a group elects to file consolidated returns, only one return may be filed on behalf of all of the affiliated corporations. Once the members of a group make the election, federal tax regulations require the "common parent" of the group to act as "sole agent" for "all matters relating to the federal income tax liability for the consolidated return year for each member of the group . . ." Treas. Reg. § 1.1502-

---

[8] Each member of the affiliated group remains severally liable for the full amount of the consolidated tax liability. Treas. Reg. § 1.1502-6(a).

77(a)(1).   From that point forward, only the parent, as agent, is permitted to interact with the IRS on matters relating to group tax filings.   *Id.*; *see also* Treas. Reg. § 1.1502-77(d).

The tax allocation agreement in this case reaffirmed Bancorp's role as agent and intermediary for the members of the group including the Bank.   TAA §§ A.2, G.   Bancorp's role as agent is the only reason its bankruptcy estate had any contact with the tax refunds at issue.   Under the Treasury Regulations, any federal tax refund payable to a member of the group "is made directly to and in the name *of the agent* and discharges any liability of the Government to any member with respect to such refund."   Treas. Reg. § 1.1502-77(d)(5) (emphasis added); *see W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 265 (9th Cir. 1973) (discussing predecessor provision).

"The Internal Revenue Service is not concerned with the subsequent disposition of tax refunds and none of its regulations can be construed to govern this issue."   *Bob Richards,* 473 F.2d at 265.   But that point does not support the bankruptcy court's holding.   The fact that Bancorp is the group member that receives payment of a tax refund as the group's agent "does not mean that it could keep it."   *Lubin v. Cincinnati Ins. Co.*, 677 F.3d 1039, 1042 (11th Cir. 2012) (discussing insurance proceeds).   Instead, "a tax refund due from a joint return generally belongs to the company responsible for the losses that form the basis of

17

the refund." *Barnes v. Harris*, 783 F.3d 1185, 1195 (10th Cir. 2015); *see Bob Richards,* 473 F.2d at 265 (tax refund "resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior . . . year should inure to the benefit of that member").

This principle results from a straightforward application of agency law. *Bob Richards*, 473 F.2d at 265 (parent company "received the tax refund from the government only in its capacity as agent for the consolidated group" and there was no agreement "that the agent had any right to keep the refund"); *see* Restatement (Second) of Agency, § 427 ("an agent who has received goods or money for the principal has a duty to use care to keep them safely until they are remitted or delivered to the principal, and to deliver them to the principal upon his demand").

In *Barnes*, stockholders of a bank holding company sued the company's officers and directors for breach of fiduciary duty after its bank subsidiary failed. The stockholders claimed that the insiders breached their duty to stockholders by failing to recover a $9 million federal tax refund. The Tenth Circuit rejected that argument, holding that "the right to a refund, if any, belongs to the FDIC," as successor to the failed bank subsidiary. *Id.* at 1195.

The "sole asset and business" of the holding company in *Barnes* was its bank subsidiary. As a result, the court held, the holding company had no ownership interest in the tax refund and "the entirety of the refund belongs to the

18

Bank." *Barnes*, 783 F.3d at 1196.  Those also were the facts in this case, as the

bankruptcy court explained:

> For the tax year 2008, [Bancorp] filed a consolidated
> federal return for the Affiliated Group and reported that *the
> Bank* generated $34,397,709 in taxable income.  By contrast,
> *[Bancorp] did not generate any taxable income in 2008*.  In
> 2010, *the Bank* suffered at least $35,351,690 in net operating
> losses.
>
> Based upon *the Bank's net operating losses*, the
> Affiliated Group filed a tax refund request of $4,846,625 to
> recover a portion of the taxes paid *by the Bank* on its 2008
> taxable income.  In other words, the Affiliated Group sought a
> carryback tax refund – an offset of *the Bank's* 2010 net
> operating losses against *the Bank's 2008 income.*

Op. at 7 (emphasis added; citations omitted).

There is no question that under the same facts the Bank would own any

resulting refund if it were filing its own "separate return."   The Bank's

participation with Bancorp and other affiliates in consolidated federal tax filings

"cannot be construed to include the transfer of a valuable asset without further

consideration."   *Bob Richards*, 473 F.2d at 264; *see Barnes*, 783 F.3d at 1195;

*Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 208 (5th Cir. 1992) (refund

was property of FDIC as receiver for failed bank, not bankrupt holding company,

where "Bank could have generated the refund on its own had it filed income taxes

separately from the group").

The bankruptcy court mentioned the Tenth Circuit's decision in *Barnes* only once in its Opinion, mistakenly concluding that this binding authority was not relevant. *See* Op. at 24. Instead, the court erroneously reasoned, the parties' tax allocation agreement altered the parties' ownership rights in tax refunds and transferred ownership of the Bank's tax refunds to Bancorp. *Id.*

This was error. While *Barnes* acknowledges that "the existence of [an] agreement to allocate the refund" can be relevant, *Barnes*, 783 F.3d at 1196, the tax allocation agreement did not contain any such ownership transfer provision, as the Trustee admitted at argument (A273); *see Bob Richards,* 473 F.2d at 264 (relevant inquiry is whether subsidiary "voluntarily assigned its rights in the refund[s]" to parent). The agreement "speaks only to the allocation of liability" among the members of the group and says nothing about ownership of refunds. *See F.D.I.C. v. AmFin Fin. Corp.*, 757 F.3d 530, 535 (6th Cir. 2014).

Contrary to the bankruptcy court's reasoning, the agreement confirms that each subsidiary would "be treated as a separate taxpayer with [Bancorp] *merely being an intermediary* between an Affiliate and the Internal Revenue Service []," TAA § A.2, (emphasis added), making clear that group members' property rights in their tax refunds were not being altered. The bankruptcy court chose to "construe[] the word" intermediary in a "more benign and limited fashion" so that it did not interfere with the court's view that Bancorp obtained an ownership

interest in the Bank's tax refunds.  Op. at 21.  The bankruptcy court's faulty interpretation of the tax allocation agreement is discussed at greater length below. *See infra* at 28-35.

> **B.     There Is No "Limited and Procedural" Agency in Which an Agent Gains Ownership Rights in Property It Receives for Its Principal.**

The bankruptcy court acknowledged that Bancorp was the Bank's agent under both the tax allocation agreement and IRS regulations.  *See* Op. at 8, 13.  Under Colorado law, the agency relationship therefore was clearly established.  *See Stortroen v. Beneficial Fin. Co.*, 736 P.2d 391, 395 (Colo. 1987) (*en banc*) ("Agency is thus a legal relation having its source in the mutual consent of the parties.").  The court erroneously reasoned, however, that this agency was "limited and procedural only" and therefore did not protect the Bank's property rights in tax refunds that Bancorp received on its behalf.  Op. at 22, 23-24.

As a matter of law, the Bancorp's agency was general, not "limited." Colorado law recognizes two types of agents:  a general agent and a special agent. A general agent "does not require fresh authorization for each transaction," while a special agent is only authorized "to conduct a single transaction or series of transactions not involving continuity of service."  *Stortroen*, 736 P.2d at 395 (quoting Restatement (Second) of Agency, § 3).

Bancorp's agency for the Bank was a general agency that was at least as comprehensive as the agency arising under federal tax regulations, if not more so.

Op. at 22; *see* Treas. Reg. § 1.1502-77(d).[9]   As the tax allocation agreement provided, Bancorp's duties as agent included, among others, filing consolidated tax returns for the group every year, "making any election [or] application" for the group, and "taking any action in connection" with any of the foregoing, TAA § G, the last of which incorporates other responsibilities laid out in the Treasury Regulations including "fil[ing] claims for refund" and acting as the designated recipient of refunds on behalf of group members, Treas. Reg. § 1.1502-77(d)(5); *see* Op. at 13 (discussing Treasury Regulation).

An agent is duty-bound to protect and turn over any property the agent receives for its principal, as Colorado law recognizes. *Moore & Co. v. T-A-L-L-Inc.*, 792 P.2d 794, 798 (Colo. 1990) (agent's fiduciary duty includes duty "to use reasonable care in carrying out agency agreement and to account to the [principal] for all money and property received"); *see* Restatement (Third) of Agency, § 8.12, *cmt. b* ("If the agent receives property for the principal, the agent's duty is to use due care to safeguard it pending delivery to the principal."); Restatement (Second) of Agency, § 427 ("an agent who has received goods or money for the principal

_____

[9] The agency arising under federal tax regulations is also based on mutual consent, in the form of the election by members of an affiliated group of corporate taxpayers to file consolidated returns.   Treas. Reg. § 1.1502-75(b) (consent to filing consolidated return made by corporation joining in such a filing).

has a duty to use care to keep them safely until they are remitted or delivered to the principal, and to deliver them to the principal upon his demand").

The law of agency does not excuse an agent from these important responsibilities in the context of a "limited and procedural" agency, nor did the bankruptcy court identify any Colorado authority to support this central point in its reasoning.[10]   Instead, the court engaged in a rhetorical sleight of hand, asserting that "[i]n Colorado, there can be no agency relationship where the alleged agent is not subject to the control of the alleged principal." Op. at 22.

Even if true, however, that factor is only relevant to determining whether there was an agency relationship between parties instead of some different legal arrangement. *See  Stortroen*, 736 P.2d at 395 ("'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so

_____

[10] The decisions the bankruptcy court did cite were inapposite. *See* Op. at 22.  In *Imperial Capital Bancorp, Inc. v. F.D.I.C.* (*In re Imperial Capital Bancorp, Inc.*), 492 B.R. 25, 32 (S.D. Ca. 2013), the court concluded that a tax sharing agreement governed by California law supplanted the agency relationship that otherwise would arise under tax regulations.   In contrast, the tax allocation agreement here is governed by Colorado law and expressly reaffirms Bancorp's role as agent.   The bankruptcy court in *Team Fin., Inc. v. F.D.I.C. (In re Team Fin., Inc.)*, Adv. Proc. No. 09-5084, 2010 WL 1730681, at *6 (Bankr. D. Kan. Apr. 27, 2010), ignored IRS regulations detailing a common parent's duties as agent when it held that the parent's role under those regulations was merely to act as "the spokesman" for the group.   Neither decision purported to apply Colorado law, under which Bancorp became obligated to safeguard and turn over the Bank's refunds as a consequence of its acceptance of its role as the Bank's agent.

to act.'") (quoting Restatement (Second) of Agency, § 1(1)).  Both of the cases the bankruptcy court cited for its "control" point turned on whether the parties had consented to an agent-principal relationship.  *See Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1451 (10th Cir. 1996) (no agency relationship between parent and subsidiary concerning funds in disputed bank account); *Montano v. Land Title Guarantee Co.*, 778 P.2d 328, 331 (Colo. App. 1989) (finding no agency relationship existed)).[11]

There was no such dispute in this case.  Instead, the bankruptcy court found that "[t]here can be *no doubt whatsoever* that [Bancorp] was indeed an 'agent' under the TAA and IRS regulations."  Op. at 21 (emphasis added); *see also id.* at 8, 13 (finding agency relationship and explaining its sources).

If control by the principal were relevant, however, the TAA provided the Bank control over any meaningful actions taken on its behalf by Bancorp in its dealings with taxing authorities.  Bancorp was required to treat the Bank "as a separate taxpayer with [Bancorp] *merely being an intermediary*."  TAA § A.2 (emphasis added).  The mechanics of tax payments were carefully delineated,

---

[11] The bankruptcy court also cited the unpublished and expressly non-precedential decision in *Cantor v. F.D.I.C. (In re Downey Fin. Corp.),* 593 F. App'x 123 (3d Cir. 2015) (*per curiam*), which involved a different tax sharing agreement that was governed by California law.  *See* Opp. at 22.  The *Downey* court did not attempt to reconcile its reasoning with the basic tenets of agency law discussed above.

TAA §§ A.1, E.1, H.1, and the agreement required Bancorp to turn over carryback refunds it received on the Bank's behalf no later than 10 business days after they were received from the IRS, TAA § H.1.   Although the agreement allowed Bancorp discretion to "make election[s]" on behalf of the group, TAA § G, that discretion was limited by all of the other provisions in the agreement, including a provision requiring that the Bank "shall never be liable for payments . . . in excess of what [its] tax liability would be computed on a separate entity basis." TAA § C.5.

The legal fiction that Bancorp was only agent in a "limited and procedural" agency did not justify the bankruptcy court's erroneous conclusion that the tax allocation agreement transferred ownership of the Bank's tax refunds to its holding company.  *See Bob Richards*, 473 F.2d at 265 (subsidiary owned refund received by parent as agent even though IRS regulations under which agency arose were "procedural in purpose" and were "adopted solely for the convenience and protection of the federal government").

### C.   Bancorp's Bankruptcy Did Not Alter the Parties' Rights in Tax Refunds Received by Bancorp as Agent.

The parties' respective ownership rights in the Bank's tax refunds also did not change because of Bancorp's bankruptcy petition.  Bankruptcy law does not create new property rights that did not exist before a debtor filed for bankruptcy. *Butner v. United States*, 440 U.S. 48, 55 (1979).

25

"The plain text of § 541(d) [of the Bankruptcy Code] excludes property from the estate where the bankrupt entity is *only a delivery vehicle* and lacks any equitable interest in the property it delivers." *City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*, 329 F.3d 204, 210 (1st Cir. 2003) (emphasis added); *see* 11 U.S.C. § 541(d) (excluding from "property of the estate" any property in which the debtor holds "only legal title and not an equitable interest.").[12]

Consistent with this principle, courts recognize that "[p]roperty held by a debtor as agent does not become property of the estate, as it belongs to someone else, usually the principal." *Greenfield Direct Resp., Inc. v. ADCO List Mgmt. (In re Greenfield Direct Resp., Inc.)*, 171 B.R. 848, 857 (Bankr. N.D. Ill. 1994); *see Lubin v. Cincinnati Ins.*, 677 F.3d at 1042 ("In other words, 'if property is in the debtor's hands as agent, the property or proceeds therefrom are not treated as property of the debtor's estate.'").

The Senate and House Reports that preceded the enactment of the Bankruptcy Code make this clear.  In those reports, Congress observed:

---

[12] *See Begier v. Internal Rev. Svc.,* 496 U.S. 53, 61-65 (1990) (§ 541(d) excluded funds from property of the estate that were withheld from employees' salaries to pay FICA taxes even though funds were never maintained in a separate account); *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 934 (6th Cir. 2000) (funds excluded from property of the estate where debtor was agent in receiving check intended for new corporation); *T&B Scottsdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) (funds deposited in debtor's account to pay materialmen were not property of the estate).

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, *but will be held in trust for another.* For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed.

S. Rep. No. 95-989, at 82 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5868

(emphasis added); *see also* H.R. Rep. No. 95-595, at 368 (1977), *reprinted in* 1978

U.S.C.C.A.N. 5963, 6324.[13]

Colorado bankruptcy courts have recognized this principle. *See Wadsworth v. High Speed Aggregate, Inc. (In re Trick Techs., Inc.)*, Adv. Proc. No. 12-01622, 2013 WL 3865592, *2 (Bankr. D. Colo. July 22, 2013) (payment to law firm's

---

[13] The bankruptcy court's discussion of trust law in its Opinion was another diversion. *See* Op. at 23. If a party receives property in circumstances in which it has no right to retain it, the law will impose a "specific trust." *Bob Richards*, 473 F.2d at 265. Colorado law recognizes this type of trust imposed by law as a "resulting trust," which can be imposed to prevent "inequitable appropriation" of bank accounts or other property. *Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 740 (Colo. 1991) (quoting *Cox v. Metropolitan State Bank, Inc.*, 336 P.2d 742, 748 (Colo. 1959)). In bankruptcy, imposition of a resulting trust is a judicial recognition that "the trust property never belong[ed] to the debtor" and therefore never was available to satisfy creditors' claims. *AmFin*, 757 F.3d at 537 (quoting *Rollins v. Neilson (In re Cedar Funding, Inc.)*, 408 B.R. 299, 314 (Bankr. N.D. Cal. 2009)). The circumstances in which Colorado law will impose a resulting trust are far broader than the bankruptcy court suggested, as *Mancuso* makes clear. See *Mancuso*, 818 P.2d at 739-40 (question of fact concerning plaintiff's intent in opening joint bank accounts precluded judgment for bank concerning set-off against account balances).

trust account for purpose of paying client's restitution judgment was never the law firm's property); *In re West Central Housing Org.*, 338 B.R. 482, 490 (Bankr. D. Colo. 2005) ("[I]t is plain that Congress intended that in any situation where the debtor was intended to be a mere conduit of the property in its possession and was never intended to have the beneficial interest, § 541(d) excludes that property from the estate.").

The bankruptcy court disregarded this law. There was no dispute that outside of bankruptcy, Bancorp never could have appropriated the Bank's tax refunds to satisfy its own debts. Yet that is the result of the bankruptcy court's erroneous holding solely because of the Bancorp bankruptcy petition. The result is an unwarranted windfall for Bancorp's creditors at the FDIC-Receiver's expense. *See LAN Tamers*, 329 F.3d at 215 ("LAN Tamers served only as a delivery vehicle for federally regulated reimbursements derived from the USF . . . . The reimbursements were never part of the bankruptcy estate, so creditors never had a claim to them.").

## II.   THE BANKRUPTCY COURT'S ANALYSIS CONFLICTS WITH THE PLAIN LANGUAGE OF THE AGREEMENT.

### A.   The Bank Did Not Agree to Transfer Ownership of its Tax Refunds in the Tax Allocation Agreement.

The bankruptcy court's analysis of the tax allocation agreement suffered from a number of fundamental errors. The court searched the contract for support

for its conclusion that tax refunds were property of the Bancorp estate.  Op. at 15-19.  In doing so, the court erroneously discounted provisions that conflicted with that goal, resulting in the court mistakenly shifting the burden to the FDIC-Receiver when agency law presumed the Bank's ownership of its refunds in the absence of an agreement to the contrary.

The question the bankruptcy court should have been answering was whether the Bank "voluntarily assigned its rights in the refund[s]" to Bancorp through any of the provisions in the tax allocation agreement.  *Bob Richards,* 473 F2.d at 264; *see Barnes*, 783 F.3d at 1196.  The plain language of the agreement read as a whole confirms the agency relationship and demonstrates that there was no ownership transfer.  *See Lubin v. F.D.I.C.*, No. 1:10-CV-00874, 2011 WL 825751, *5 (N.D. Ga. Mar. 2, 2011).

The tax allocation agreement confirmed Bancorp's appointment as the agent for the Bank in dealings with taxing authorities.  TAA, § G.  In addition, the agreement's "General Rules" provided that the Bank shall "be treated as a separate taxpayer with [Bancorp] *merely being an intermediary* between an Affiliate and the Internal Revenue Service []."  TAA § A.2 (emphasis added).  Under Colorado law, the language of a contract "must be examined and construed in harmony with the plain and generally accepted meaning of the words used."  *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005) (internal

citations omitted).   These provisions established that the Bank did not intend to transfer ownership of its tax refunds by entering into the agreement.   *See also* TAA § A.1 (if Bank "incurs a net operating loss . . . , [it] *is entitled to a refund equal* to the amount it would have been entitled to receive had it not joined in the filing of a consolidated return with [Bancorp]") (emphasis added)

But the bankruptcy court disregarded the obvious meaning of these provisions because they conflicted with its conclusions.   With regard to the general rule that Bancorp would be acting "merely [as] an intermediary" for the Bank, the court wrote:

> The word ["intermediary"] is certainly there in black and white. The Court simply construes the word in a more benign and limited fashion than the FDIC.   That [Bancorp] was an "intermediary" between the Bank and the IRS, appears to the Court to mean nothing more than that [Bancorp] is the corporate parent of the Affiliated Group under the IRS regulations governing consolidated federal income tax returns and fulfills the regulatory obligations of the common parent. . . . The Court does not believe that use of the word "intermediary" somehow dispositively establishes that the Tax Refund belongs to the FDIC instead of the trustee.

Op. at 21-22.   In disregarding the "intermediary" and "agent" provisions, "the bankruptcy court ignored a reasonable interpretation that the literal language of the [tax allocation agreement] supports an agency relationship with respect to tax refunds."   *F.D.I.C. v. Zucker (In re NetBank, Inc.)*, 729 F.3d 1344, 1349 (11th Cir. 2013).

Contrary to the court's reasoning, it was not the FDIC-Receiver's burden to "dispositively establish[]" that the agreement's use of the word "intermediary" assigned ownership of refunds to the Bank. It was the Trustee's burden to show that through the tax allocation agreement the Bank "voluntarily assigned" its interests in tax refunds to Bancorp. *Bob Richards*, 473 F.2d at 264; *see also Barnes*, 783 F.3d at 1196. The agreement is silent on that issue, as the Trustee admitted and the bankruptcy court recognized, (A273); *see* Op. at 17, and there was no other evidence to support the bankruptcy court's mistaken conclusion. Given that contractual silence, it was error for the court to infer that the Bank agreed to give away valuable rights for no consideration. *See AmFin*, 757 F.3d at 533-34; *NetBank*, 729 F.3d at 1350.

Instead, the court pointed to provisions under which the parties were to make "payments" or "reimbursement," and concluded based on the use of those terms that a debtor-creditor relationship had been established that supplanted the relationship of agent and principal that is otherwise expressly reaffirmed in the agreement. Op. at 16-18. This was another error.

"A debtor-creditor relationship is created by consent, express or implied." *Zucker v. F.D.I.C. (In re BankUnited Fin. Corp.)*, 727 F.3d 1100, 1108 (11th Cir. 2013). If a debtor-creditor relationship had been the parties' intention, the agreement would have included "some means of protection for the creditor to help

guarantee the debtor's obligation, such as a fixed interest rate, a fixed maturity date, or the ability to accelerate payment upon default." *BankUnited*, 727 F.3d at 1108; *see also NetBank*, 729 F.3d at 1351 n.8.  There are no such provisions here. Provisions that allocate tax liability among the members of a group or require group members to pay their share say nothing about the ownership of tax refunds. *AmFin*, 757 F.3d at 533-34.

Finally, the tax allocation agreement instructs that "[a]ny ambiguity in the interpretation hereof shall be resolved . . . in favor of any insured depository institution," that is, the Bank.  TAA § H.4.  The bankruptcy court committed further error when it disregarded that provision.  Under Colorado law, a contract is ambiguous if it is reasonably susceptible to more than one meaning.  *See Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995); *Northern Ins. Co. v. Elkstrom*, 784 P.2d 320, 323 (Colo. 1989).  If this Court concludes that there is more than one reasonable interpretation of the tax allocation agreement here, the rule of interpretation provided in the agreement itself requires that conflict to be resolved in favor of the FDIC-Receiver.

### B.    To Comply with Federal Banking Law, the Tax Allocation Agreement Adopts Provisions Protecting the Bank

Many provisions in the tax allocation agreement express the parties' intention to protect the interests of the Bank, as a regulated insured depository institution, in handling tax settlements.  For example, the first operative paragraph

of the agreement provides that any carryback refund of the Bank will be "equal to the amount it would have been entitled to receive had it not joined in the filing of a consolidated return."   TAA § A.1.   Another provision states that an insured depository institution "shall never be liable for payments to [Bancorp] under this Agreement in excess of what [its] tax liability would be computed on a separate-entity basis."   TAA § C.5.   Yet another provision requires any ambiguity in the agreement to be resolved "in favor of any insured depository institution." TAA § H.4.

These contract provisions are not accidental.  Federal banking law prevents affiliates of banks from taking advantage of the federal safety net by, among other things, strictly limiting transactions between insured banks and their holding companies under sections 23A and 23B of the Federal Reserve Act and their implementing regulations.   *See* 12 U.S.C. §§ 371c, 371c-1; 12 C.F.R. §§ 223.1, *et seq.*  Sections 23A and 23B require a bank to "treat *any of its transactions* with any person as a transaction with an affiliate to the extent that the proceeds of the transaction are used for the benefit of, or transferred to, an affiliate, such as the bank's holding company."  12 C.F.R. § 223.16(a) (emphasis added).

In the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure, 63 Fed. Reg. 64757 (Nov. 23, 1998), the four principal federal bank regulatory agencies jointly described their expectations as to how banks or

33

thrifts and their holding companies would handle income tax allocation and settlements. The regulators warned that "[a]ny practice that is not consistent with this policy statement may be viewed as an unsafe and unsound practice prompting either informal or formal corrective action." 63 Fed. Reg. at 64758.

Consistent with sections 23A and 23B, the regulators' expectations included that tax settlements would not result in any less favorable treatment to a bank subsidiary than it would have received if it filed its taxes as a separate entity. *Id.* at 64757-58. In addition, the regulators cautioned:

> a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members. Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

*Id.* at 64759.

"[I]n construing a contract courts must also consider 'the subject matter, the object of making it, the sense in which the parties naturally understood it at the time it was made, and the purposes and objects to be accomplished thereby.'" *Level 3 Comm'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (quoting *Total Petroleum, Inc. v. Farrar*, 787 P.2d 164, 167 (Colo. 1990)). Given the provisions of the tax allocation agreement mentioned above, there can be no serious doubt that the agreement was drafted with this regulatory guidance in mind.

34

*See* TAA § A.1 (Bank "entitled to receive a refund equal to the amount it would have been entitled to receive had it not joined in the filing of a consolidated return with [Bancorp]"); TAA § C.5 (Bank "shall never be liable for payments to [Bancorp] under this Agreement in excess of what [its] tax liability would be computed on a separate entity basis"); TAA § G (Bancorp appointed agent for Bank).

In *NetBank*, evidence of the parties' intention to comply with the Interagency Policy Statement was read as confirming their intention to maintain a relationship of agent and principal between the holding company and its bank subsidiary. *NetBank*, 729 F.3d at 1350. The bankruptcy court's failure to take this context into account in construing the tax allocation agreement against the Bank was further error.

CONCLUSION

For all of the foregoing reasons, the Opinion and judgment of the bankruptcy court should be reversed and this Court should hold that the tax refunds at issue are the property of the FDIC-Receiver as the statutory successor to the Bank.

Dated: Denver, Colorado
       December 21, 2016

Respectfully submitted,

By:   s/ John F. Young
       John F. Young

Of Counsel:

B. Amon James
Senior Counsel

Sonya L. Levine
Counsel

Federal Deposit Insurance
Corporation
3501 North Fairfax Drive
Arlington, Virginia 22226
Tel. (703) 562-2783

Markus Williams Young & Zimmerman LLC
1700 Lincoln Street, Suite 4550
Denver, CO 80203
(303) 830-0800
jyoung@markuswilliams.com

    - and -

John J. Clarke, Jr.
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020
(212) 335-4500
john.clarke@dlapiper.com

Attorneys for Appellant
  Federal Deposit Insurance Corporation, as
  Receiver for United Western Bank

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 8015 (a)(7)(B) of the Federal Rules of Bankruptcy Procedure because it contains 8,691 words, excluding the parts of the brief exempted by Bankruptcy Rule 8015(a)(7)(B)(iii), as determined using Microsoft Word.   This brief complies with the typeface requirements and the type style requirements of Bankruptcy Rule 8015(a)(6) because it has been prepared in a proportionally spaced 14-point typeface using Microsoft Word 2010.

_s/ John F. Young_____
John F. Young

Dated:  December 21, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2016, I caused a true and correct copy of the foregoing opening brief to be filed with the Court's Electronic Case Filing system, which will cause the brief to be on all counsel of record who have appeared in this action.

s/ John F. Young

John F. Young

EAST\137983798